**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ANTWON D. GOLATTE, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| CITY OF CHICAGO, a municipal corporation, CHICAGO POLICE OFFICERS JAIME GAETA, STAR #17317, HARRY MATHEOS, STAR #18599, MATT DERCOLA, STAR #15740, JAMES WHIGHAM, STAR #3462, KATHLEEN SCHMIDT, STAR #11387, | ) ) ) ) ) ) ) ) ) ) No. 17 C 00929<br><br>Judge John J. Tharp, Jr. |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Antwon Golatte brings this action stemming from a traffic stop in February 2015 that led to his shooting, alleging that defendant Chicago Police Officers Jaime Gaeta, Harry Matheos, Matt Dercola, James Whigham, and Kathleen Schmidt violated his constitutional rights in violation of 42 U.S.C. § 1983. Specifically, Golatte brings claims of excessive force, false arrest, failure to intervene, and conspiracy under § 1983 against the individual defendants, a *Monell* claim and a claim for indemnification as to the City of Chicago, and a state law tort claim for malicious prosecution against all defendants. This Court previously granted the City's motion to bifurcate and stay Golatte's *Monell* claim. The defendants have moved for summary judgment on the other claims. For the following reasons, the defendants' motion for summary judgment is granted in part and denied in part.

## BACKGROUND

At the time of the incident in February 2015, Plaintiff Antwon Golatte had served as a confidential informant for the Chicago Police Department for three years, working primarily with Officer Kathleen Schmidt in the narcotics unit. PSOF ¶¶ 2-3. The other defendant officers worked in the gang enforcement unit. DSOF ¶¶ 6-7. The plaintiff asserts that on February 5, two days before the main incident at issue in this case, Officers Matheos, Dercola, and Gaeta detained Golatte in front of his home for 20-30 minutes, searched his car, and found a bag with papers and currency in it. Golatte told the officers that he was an informant. PSOF ¶ 7. The implication, according to the plaintiff, is that as of February 5, the officers were familiar with Golatte's car and residence and knew that he was a confidential informant. Resp. MSJ at 7, ECF No. 123.

On February 7, 2015, Officers Matheos and Gaeta were conducting surveillance in an unmarked car. DSOF ¶ 8. The defendants allege, and the plaintiff disputes, that the officers had received an anonymous tip a week prior about someone selling narcotics out of a car similar to Golatte's and near his residence.[1] *Id.* ¶ 11. The defendants state that they observed Golatte engaging in suspected narcotics activity, including a hand-to-hand transaction inside his vehicle, and that he drove another individual a short distance: defendants aver that an indicator "of narcotics activity is when a suspected buyer gets in a vehicle for a short period of time, just long enough for

---

[1] The plaintiff disputes defendants' report of an anonymous tip: "Though in the same vehicle when they encountered this 'concerned citizen,' Gaeta stated that the citizen was a male and Matheos stated that she was a female. Gaeta did not get the person's name because he wanted to be anonymous, nor did he get a phone number or information about where the person lived. Matheos does not recall the description this concerned citizen gave for Golatte. Matheos did not bother getting any information because he said he did not have a reason to investigate her . . . because this person approached them and volunteered this information . . . Matheos also did not report the contact he had with the concern[ed] citizen." Pl.'s Resp. DSOF ¶ 11 (citations omitted). According to the plaintiff, based on the lack of information and inconsistencies in defendants' recollections, the concerned citizen "may not even exist." *Id.*

2

a transaction to take place, and then exits the vehicle."[2] *Id.* ¶¶ 14-19. The plaintiff disputes defendants' account, noting that Officer Matheos testified that he could not see what Golatte was doing inside the car and could not see any money or drugs. Pl.'s Resp. DSOF ¶ 12. Officers Gaeta and Matheos were positioned roughly 200 yards from Golatte's vehicle and did not have binoculars or another visual aid. *Id.* Officer Gaeta phoned[3] Officers Whigham and Dercola and asked them to pull Golatte over to investigate. *Id.* ¶ 20.

Officers Whigham and Dercola pulled Golatte over and parked their unmarked Chevrolet Impala approximately eight to ten feet behind Golatte's Lincoln Aviator.[4] *Id.* ¶¶ 21, 25. As the officers approached Golatte's car, they could see his hands and face and did not see any weapons or drugs. PSOF ¶¶ 15-16. Golatte provided his license and insurance information. *Id.* ¶ 10. Golatte lowered his window approximately six inches to speak to Officer Dercola, who ordered him to step out of the car; he refused and instead called 911 and his CPD contact, Officer Schmidt. DSOF ¶¶ 26-29. Officer Dercola never told Golatte that he was under arrest or being detained. PSOF ¶ 13. Officers Matheos and Gaeta arrived on the scene and pulled in front of Golatte's car, boxing

---

[2] The plaintiff avers that "no one approached his driver's side door" and that the individual he drove a short distanced worked for him keeping up the house; Golatte was going to pick up a friend and dropped him off at another property nearby to work. Pl.'s Resp. DSOF ¶¶ 15, 19.

[3] Throughout the events of February 7, the defendant officers used their cell phones rather than their CPD radios. Resp. MSJ at 1, ECF No. 123. Plaintiff asserts that the officers used their personal phones to avoid the creation of an official record of their activity; the defendants do not address the point in their briefing, but indicate in their testimony that they wanted to avoid tying up the radio frequency, that "bad guys have radios, too," and that they wanted to communicate with the other officers more directly than using the radio, which reached two districts, would allow. *See* Gaeta Tr. 135:7-10, ECF No. 108-2; Matheos Tr. 76:8–79:7, ECF No. 108-9; Whigham Tr. 33:11–35:17, ECF No. 108-12.

[4] The plaintiff notes that defendants' distance estimate has changed: "Whigham testified that the vehicle he and Dercola drove[] pulled up two and a half feet behind Golatte's vehicle. During his IPRA interview, Whigham stated that it was 4-5 feet. Dercola testified that the Impala was 5-8 feet behind Golatte; 8-10 feet; 5-10 feet; and maybe 10 feet at most, maybe less than that." Pl.'s Resp. DSOF ¶ 25 (citations omitted).

3

him in with each police car roughly six to ten feet away. Pl.'s Resp. DSOF ¶ 32. Golatte attempted to have the officers speak with Officer Schmidt on his cell phone, but he refused to exit the vehicle.[5] *See id.* ¶¶ 28-29; Def.'s Resp. PSOF ¶¶ 18-19. Officers Matheos and Gaeta approached the vehicle and drew their weapons. Def.'s Resp. PSOF ¶ 18. Officer Whigham moved from his position on the passenger side of the vehicle to the driver's side, near the gas tank. Pl.'s Resp. DSOF ¶¶ 40-41.

The four officers stood along the driver's side of the vehicle, with Officer Gaeta standing near the driver's side window, with Officer Matheos to his right, then Officer Dercola and Officer Whigham.[6] DSOF ¶¶ 38-41. None of the officers were directly behind or in front of Golatte's car; the four officers were approximately five feet from the car on the driver's side. Pl.'s Resp. DSOF ¶¶ 57-58. Officer Whigham reported that there were a few cars on the road, but not much traffic, and "he did not see any people," while Officer Gaeta said he was not paying attention to traffic at the time. *Id.* ¶¶ 23-24.

Officer Gaeta got up on the running board of Golatte's car and attempted to force the driver's side window down, shattering the window in the process. PSOF ¶ 19; Pl.'s Resp. DSOF ¶¶ 28, 37, 42-43. Golatte reversed the car and backed up, striking the police car behind him. Pl.'s Resp. DSOF ¶ 47.[7] Officer Dercola backpedaled south, toward the middle of the street, to avoid

---

[5] Officer Schmidt was not on scene for these events; she was "working in a covert car up north," DSOF ¶ 30, spoke on the phone with Golatte during the traffic stop, and "did not know that Golatte was shot until after she heard him say on the phone that he was shot," *id.* ¶ 73.

[6] There is some dispute about which officer stood in which position: the plaintiff avers that Officer Whigham testified that Officer Dercola stood closest to the front of the vehicle, with Officers Gaeta, Matheos, and Whigham to his right in that order, but later changed his testimony. Pl.'s Resp. DSOF ¶ 39.

[7] The plaintiff disputes whether this contact resulted in damage to the police car, as it was in "raggedy" condition to begin with and the photos of the vehicle showing the damage were taken 19 days after the incident. Pl.'s Resp. DSOF ¶ 47.

being hit by the Aviator. *Id*. ¶ 48. None of the officers were ever directly in Golatte's path. *See id.* ¶¶ 40-41, 45, 50-51. The defendants allege that "[s]econds before Golatte drove the Aviator in reverse, Whigham was standing directly behind it," and that Officer Gaeta "testified that he saw Whigham diving out of the way of the Aviator as it drove in reverse and thought that he was hit," but Officer Whigham's testimony contradicts these assertions. *Id.* ¶ 50. Officer Whigham had previously moved from the passenger's side to the driver's side and "testified that Golatte never tried to back up over him" and that moving two to three feet away from the vehicle was enough to place him a safe distance away from the car. *Id.* ¶ 51.

Golatte accelerated forward and turned to the left, swerving slightly into the eastbound lane to get around the police car in front of him. DSOF ¶ 60; PSOF ¶ 26. Golatte does not recall how fast the car was going, but the defendant officers report that his tires screeched. Pl.'s Resp. DSOF ¶¶ 61-62. Even when Golatte turned to the left, none of the four officers were ever directly in his path. *Id.* ¶ 60. As Golatte was driving forward, Officers Matheos and Gaeta fired their weapons, Matheos once and Gaeta three times. DSOF ¶¶ 66, 68. Golatte was shot in his lower left side. Golatte crashed into a nearby gas line, Golatte Tr. 798:20–799:6, ECF No. 115-44, and was transported to Christ Hospital. *See* PSOF ¶ 24. Neither Officer Whigham nor Officer Dercola unholstered their weapons at any point, Pl.'s Resp. DSOF ¶ 71; Def.'s Resp. PSOF ¶ 18, and Officer Whigham reported that he was "shocked" after seeing Officers Gaeta and Matheos discharge their weapons. Pl.'s Resp. DSOF ¶ 68. There were no bullet holes in the front windshield of Golatte's car, PSOF ¶ 22, and all shots were fired while he was driving forward, Def.'s Resp. PSOF ¶ 23.

In the aftermath of these events, Golatte was charged with aggravated assault of four peace officers and criminal damage to government property. After a jury trial, he was acquitted on all

5

charges.[8] PSOF ¶ 34. The defendant police officers provided information that was used in Golatte's trial. *Id.* ¶¶ 27-31, 33. The Independent Police Review Authority conducted an investigation and found that the officers' use of force in firing into Golatte's vehicle after moving out of the vehicle's path was objectively unreasonable and violated police policy. *Id.* ¶¶ 35-36.

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party has the initial burden of establishing that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this burden, "[t]he nonmoving party must point to specific facts showing that there is a genuine issue for trial." *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). Factual disputes do "not preclude summary judgment when the dispute does not involve a material fact." *Burton v. Downey*, 805 F.3d 776, 783 (7th Cir. 2015). When considering the summary judgment materials, the Court must "construe all facts and draw all reasonable inferences in favor of the nonmoving party." *Van den Bosch v. Raemisch*, 658 F.3d 778, 785 (7th Cir. 2011).

### I. Excessive Force

"A police officer's use of deadly force on a suspect is a seizure within the meaning of the Fourth Amendment, so the force must be reasonable to be constitutional." *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Supreme Court set forth the framework for analyzing excessive

---

[8] The defendants state that Golatte had seven bags of cannabis in the sunroof of his car at the time of the traffic stop, but the parties agree that he was not charged with any drug-related offenses. Pl.'s Resp. DSOF ¶¶ 74-75.

6

force claims in *Tennessee v. Garner*, 471 U.S. 1 (1985) and *Graham v. Connor*, 490 U.S. 386 (1989). "*Graham* and *Garner* stand for the proposition that a suspect has a constitutional right not to be shot by an officer unless he reasonably believes that [the suspect] poses a threat to the officer or someone else." *Horton*, 883 F.3d at 949 (internal quotation marks and citation omitted). "The issue of whether an intentional use of deadly force by a police officer is permissible under the Fourth Amendment requires an objective reasonableness inquiry. The officer's subjective belief or motivations are irrelevant." *Scott v. Edinburg*, 346 F.3d 752, 756 (7th Cir. 2003) (citations omitted). "Even though an officer may in one moment confront circumstances in which he could constitutionally use deadly force, that does not necessarily mean he may still constitutionally use deadly force the next moment." *Horton*, 883 F.3d at 950.

The defendant officers[9] argue that their use of force was a reasonable act in self-defense and defense of others or, alternatively, that they are entitled to qualified immunity. The Supreme Court's decision in *Garner* makes clear that when a "suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so . . . A police officer may not seize an unarmed, nondangerous suspect by shooting him dead." 471 U.S. at 11 (finding Tennessee statute "unconstitutional insofar as it authorizes the use of deadly force against such fleeing suspects"). The undisputed facts indicate that Golatte was unarmed, he had been stopped on suspicion of nonviolent narcotics activity, and he refused to exit the vehicle. When Golatte's vehicle was in motion, all four officers were on the driver's side and were not directly behind or in front of his car, even when he turned to the left to maneuver around the police car in front of him. *See* Pl.'s Resp. DSOF ¶¶ 40-41, 45,

---

[9] The parties agree that Golatte's excessive force claim is brought only against Officers Matheos and Gaeta, not Officers Dercola, Whigham, and Schmidt. Resp. MSJ at 12, ECF No. 123.

50-51. Though at least one of the officers stepped back toward the middle of the street to get out of Golatte's way, the parties dispute whether they were at any risk of being hit by Golatte or by oncoming traffic. *See* DSOF ¶¶ 48-49; Pl.'s Resp. DSOF ¶¶ 66-69. Officer Whigham reported that there were few cars on the road and that he did not see any people. Pl.'s Resp. DSOF ¶ 24. Whether Golatte posed a danger to the officers or to others in his attempted flight that would make the defendant officers' use of force reasonable rests on issues of disputed fact.

Even if the officers could reasonably have used force in one moment, such as when Golatte was reversing the vehicle, that does not necessarily mean that their use of force was reasonable in the next moment, when Golatte began to drive forward. There is some dispute as to whether the officers thought that Golatte posed a danger to Officer Whigham when he reversed the car that would justify their use of force. Officer Gaeta testified that he thought that Officer Whigham was behind the car as it reversed and thought that he was hit, and Officer Matheos testified that the last time he saw Officer Whigham he was between the two cars. By contrast, Officer Dercola testified that all four officers were on the driver's side when Golatte drove forward, and Officer Whigham's own testimony indicates that he was with the other officers on the driver's side of the car the whole time that it was in motion and that he never had to "dive out of the way" to avoid being hit. Pl.'s Resp. DSOF ¶¶ 51-52. In addition, the parties dispute whether Officers Gaeta and Matheos ceased fire "[a]s soon as the vehicle had passed both of them and the threat was over," or whether they fired after Golatte had passed the officers. *Id.* ¶¶ 56, 66, 68, 72. Golatte was shot in the left side, crashed into a nearby gas line, and was taken to the hospital; the record does not show that anyone other than Golatte was injured.

Because this inquiry is fact-dependent, many of the relevant facts are disputed, and minor distinctions between the competing versions are highly material, Golatte's excessive force claim

8

must be resolved by a jury rather than on summary judgment. Similarly, when facts material to a claim of qualified immunity remain in dispute, summary judgment is inappropriate. Without a settled set of facts, it is premature for the court to analyze the purely legal question of whether a defendant is entitled to qualified immunity. *See Morfin v. City of East Chicago*, 349 F.3d 989, 1000 n.13 (7th Cir. 2003) (when a plaintiff "presents a factual account where a reasonable officer would *not* be justified in making an arrest, then a material dispute of fact exists. Where there is a genuine issue of material fact surrounding the question of plaintiff's conduct, we cannot determine, as a matter of law, what predicate facts exist to decide whether or not the officer's conduct clearly violated established law."). The defendants' motion for summary judgment is denied as to Golatte's excessive force claim.

## II. False Arrest

Golatte alleges that the defendant officers[10] unlawfully detained him in violation of his Fourth Amendment rights; the officers assert that they had probable cause to detain him. "The existence of probable cause to arrest is an absolute defense to any § 1983 claim against a police officer for false arrest or false imprisonment." *Abbott v. Sangamon County*, 705 F.3d 706, 713-14 (7th Cir. 2013). Probable cause exists if "the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Id.* at 714. Determining whether an officer had probable cause to arrest entails a purely objective inquiry; the officer's

---

[10] The plaintiff concedes that Officer Schmidt did not take part in his arrest, and therefore that this claim is not asserted against her. Resp. MSJ at 6, ECF No. 123.

subjective state of mind and beliefs are irrelevant. *Whren v. United States*, 517 U.S. 806, 813 (1996); *Tebbens v. Mushol*, 692 F.3d 807, 819 (7th Cir. 2012).

Although denominated as a "false arrest" claim, the plaintiff asserts that the defendants violated his Fourth Amendment rights when they pulled him over—that is, before he was arrested. The defendant officers allege that they had reasonable suspicion sufficient to stop Golatte based on the anonymous tip from the concerned citizen, their observation of Golatte conducting a hand-to-hand transaction, and his short drive with another passenger. As noted, the plaintiff disputes these allegations: the defendant officers did not obtain any identifying information from the anonymous tipper, Officer Matheos admitted that he did not see any money or drugs while surveilling Golatte, and the short trip was incidental rather than indicative of narcotics activity. Pl.'s Resp. DSOF ¶¶ 11-12, 15-19. Moreover, the plaintiff states that the defendant officers knew that he was a confidential informant, and so any suspected narcotics activity could have been in the service of his informant role. *See* PSOF ¶¶ 5-7; Pl.'s Resp. DSOF ¶ 75. Following a lawful traffic stop, the police may, as a matter of course, order the driver and the passengers out of the vehicle pending the completion of the stop without violating the protections of the Fourth Amendment, *Maryland v. Wilson*, 519 U.S. 408 (1997), but here there are disputes of material fact as to whether the officers had reasonable suspicion to lawfully stop Golatte. To the extent that the Fourth Amendment claim is premised on the traffic stop, it must go to a jury.

Once the traffic stop was in progress and Golatte had refused to exit the car, the defendants aver that they had probable cause to arrest him on a charge of obstruction of a peace officer, though he was not arrested and was not ultimately charged with obstruction. The existence of probable cause to arrest for any crime, whether charged or not, may defeat a plaintiff's false arrest claim. *See Devenpeck v. Alford*, 543 U.S. 146, 153-55 (2004) (where officer has probable cause to arrest

10

a suspect for any crime, there is no Fourth Amendment violation even if the officer lacked probable cause with respect to the actual offense charged). Under Illinois law, a person commits obstruction when they knowingly resist or obstruct "the performance by one known to the person to be a police officer, firefighter, or correctional institution employee of any authorized act within his or her official capacity." 720 Ill. Comp. Stat. § 5/31-1(a). "The statute prohibits two kinds of interference with police activities": resisting and obstructing. *Martinez v. City of Chicago*, 900 F.3d 838, 848 (7th Cir. 2018). Although mere argument with an officer or noncompliance is generally insufficient to constitute a violation of § 5/31-1 under the resisting prong, *Abbott*, 705 F.3d at 721 (citing *People v. Raby*, 40 Ill. 2d 392, 399, 240 N.E.2d 595, 599 (Ill. 1968)), "the other form of official interference prohibited by 720 ILCS 5/31-1(a), obstruction, does not turn on the performance of a physical act; instead, it is focused on the *consequence* of the interference." *Martinez*, 900 F.3d at 848. Illinois courts have therefore held that "repeatedly refusing an officer's order to exit a vehicle may also violate section 31-1(a)." *People v. Ostrowski,* 394 Ill. App. 3d 82, 98, 914 N.E.2d 558, 571 (Ill. App. Ct. 2009); *see also People v. Synnott,* 349 Ill. App. 3d 223, 227-28, 811 N.E.2d 236, 240-41 (Ill. App. Ct. 2004).[11] Passive refusal to exit a vehicle, moreover, may constitute obstruction "if the conduct impeded the officer's attempt to execute an arrest . . . even if the underlying attempted arrest was unwarranted." *Ostrowski*, 394 Ill. App. 3d at 98, 914 N.E.2d at 571 (citing *People v. McCoy*, 378 Ill. App. 3d 954, 962, 964, 881 N.E.2d 621, 630-31 (Ill. App. Ct. 2008)).

It is undisputed that Golatte refused to exit the vehicle after repeated orders to do so. *See* Pl.'s Resp. DSOF ¶¶ 28, 34; PSOF ¶ 14. It is also clear that in refusing to comply with the officers'

---

[11] Golatte's attempt to distinguish these cases on their facts ignores the distinction between resisting a peace officer and obstructing a peace officer, which requires no physical resistance.

11

command to get out of the car, Golatte hindered them in determining whether a narcotics transaction had taken place. Accordingly, under Illinois law, the officers had probable cause to arrest Golatte for obstructing a peace officer. Although it is not entirely clear when the incident crossed the line separating an investigative stop and became an arrest, that is of consequence only if deemed to occur before Golatte refused the officers' orders to get out of the vehicle. After that point, there was probable cause to arrest Golatte for obstruction. Though subsequent facts are in dispute,[12] there may also have been probable cause to arrest for other crimes as well once Golatte tried to get away from the officers, but the fact disputes concerning those issues do not matter; probable cause for only one crime is sufficient to support an arrest. Defendants' motion for summary judgment based on Fourth Amendment violations is therefore denied as to the traffic stop but granted as to Golatte's false arrest claim.

## III. Failure to Intervene

Golatte also alleges that the defendant police officers failed to intervene to prevent the officers' use of excessive force and his false arrest. To prevail on his failure to intervene claim, Golatte must establish that the defendant officers "had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic

---

[12] In their initial briefing, defendants refer solely to narcotics and obstruction as the claims for which they had probable cause: assault and criminal damage to government property are not mentioned until the reply brief. *See* Mem. Supp. MSJ at 3-6, ECF No. 109; Reply MSJ at 10, ECF No. 133. To the extent that the defendants base their claim of probable cause on assault, criminal damage, fleeing the scene of an accident, or resisting arrest, the existence of probable cause as to those crimes turns on disputed facts, and therefore summary judgment would be inappropriate.

opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).

As to Golatte's excessive force claim, the defendants aver that the officers did not have sufficient time to intervene. The defendants state that the events leading up to Golatte's shooting took place in a matter of seconds; while the plaintiff purports to dispute that claim, he does not provide another time estimate. *See* Pl.'s Resp. DSOF ¶¶ 43, 70. Officers Dercola and Whigham state that they were focused on moving out of Golatte's way rather than monitoring what the other officers were doing, *id.* ¶¶ 48-49, and Officer Whigham testified that he was "shocked" when Officers Gaeta and Matheos fired their weapons, *id.* ¶ 66. The Court notes, however, that Officers Gaeta and Matheos had drawn their weapons before Golatte put the car in reverse, which the other officers presumably observed. Def.'s Resp. PSOF ¶ 18. Given these disputes, the determination of whether the officers could reasonably have intervened is best left for the finder of fact. *See Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (noting that failure to intervene claims "almost always implicate questions of fact for the jury"); *Lanigan v. Village of East Hazel Crest*, 110 F.3d 467, 478 (7th Cir. 1997) ("Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise."). As such, the motion for summary judgment on behalf of the defendant officers who were on the scene is denied.

As to Officer Schmidt, however, it is undisputed that she was not on the scene during the incident. DSOF ¶ 30. While Officer Schmidt was on the phone with Golatte throughout the proceedings, the defendants aver that she "had no reason to believe that force was being used or about to be used since she did not hear any gunshots or know that Golatte had been shot until after

13

the shooting was over." *Id.* ¶ 73. The Court agrees that Officer Schmidt was not in the same position as the other officers to gauge the situation and intervene to prevent Golatte's shooting. *See Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014) ("And it is undisputed that Stange and Gonzalez were not together and therefore did not have time to confer or plan any sort of use of force . . . The only opportunity Stange would have had to intervene would have been as he saw Gonzalez jumping the fence, and by then there was no reasonable opportunity to intervene."). Accordingly, summary judgment is granted for Officer Schmidt with respect to failure to intervene in the use of excessive force.

With respect to Golatte's claim for failure to intervene in the allegedly unlawful traffic stop,[13] the same fact disputes that preclude summary judgment on the legitimacy of the traffic stop preclude summary judgment on the assertion that the defendants involved should have intervened to stop it. That is true, however, only of Officers Gaeta and Matheos; Golatte has adduced no evidence to support a finding that Officers Dercola and Whigham had any basis to know that the officers who requested that they stop Golatte's vehicle did not have a reasonable basis to justify an investigative stop, much less that those officers were engaged in the harassment scheme that Golatte describes. So far as the record shows here, Officers Dercola and Whigham were merely responding to a legitimate request for assistance by other officers. Given the disputes of fact and denial of summary judgment on the Fourth Amendment claim as to the traffic stop, summary judgment must be granted on Golatte's failure to intervene claim as to Officers Dercola and Whigham and denied as to Officers Gaeta and Matheos. And, as it is undisputed that Officer Schmidt did not even know of the traffic stop before it occurred and Golatte had phoned her, there

---

[13] Because Golatte's Fourth Amendment claim fails to the extent that it is based on a false arrest theory, the failure to intervene theory also fails as to false arrest.

14

is no basis to find that she had any means of assessing what had happened and then interjecting herself into Golatte's dispute with officers from another unit. Following the stop, Officer Schmidt plainly had no opportunity to discuss the situation with the officers on the scene given the brevity and intensity of the encounter. Indeed, if anything, Golatte's account supports the conclusion that Officer Schmidt attempted to intervene by telling Golatte to put her on speakerphone so that she could talk to the officers who had detained him. PSOF ¶ 18. She never had the opportunity to do so, however, because "[a]t that point when Golatte put Schmidt on speaker phone, Gaeta grabbed the window" and broke it (prompting Golatte to put the vehicle in reverse in an effort to get away). *Id.* ¶ 19. Summary judgment is granted as to Officers Schmidt, Dercola, and Whigham and denied as to Gaeta and Matheos on Golatte's claim for failure to intervene in the allegedly unlawful traffic stop.

### IV. Conspiracy

Golatte alleges that the defendants conspired to cover up their use of excessive force against him. Under § 1983, a conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Scherer v. Balkema*, 840 F.2d 437, 441 (7th Cir. 1988). To establish a prima facie case of civil conspiracy, a plaintiff must show "an express or implied agreement among defendants to deprive a plaintiff of his or her constitutional rights," and the "actual deprivation of those rights in the form of overt acts in furtherance of the agreement." *Id.* at 442.

A "conspiracy claim cannot survive summary judgment if the allegations are vague, conclusionary and include no overt acts reasonably related to promoting the conspiracy." *Amundsen v. Chi. Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000) (internal quotation marks omitted). In his response brief, Golatte simply states that "Evidence is clear, by their actions, that they were willful participants, had an understanding to jointly deprive Golatte of his constitution [sic] rights on the date of the incident and subsequently by their testimony in four proceedings and reports they either authored or acquiesced." Resp. MSJ at 17, ECF No. 123 (citing PSOF ¶¶ 27-36). The cited portion of plaintiff's statement of material facts indicates that the defendant police officers provided information and gave testimony that was used in a variety of settings, including in Golatte's criminal trial and in proceedings before the Independent Police Review Authority, but does not describe what sort of information the defendant officers provided or whether it was in any way false, incomplete, or coordinated pursuant to a conspiratorial agreement. Golatte's brief in opposition to the summary judgment motion includes a single paragraph that is entirely conclusory and provides no substantive argument showing how the evidence of record supports a conspiracy finding.

If anything, Golatte's brief tends to undermine, rather than support, his conspiracy theory, as he relies heavily on inconsistencies in the officers' testimony to bolster his claims. When, for example, he highlights the discrepancy between Officer Gaeta's testimony that he saw Officer Whigham dive out of the way to avoid Golatte's vehicle as it reversed, one might have expected Whigham to have supported that testimony were he conspiring with Gaeta, but Whigham denied that he had to dive to avoid Golatte. Officer Whigham also testified that he was "shocked" when Gaeta and Matheos fired their weapons at Golatte, unhelpful testimony one would not expect from someone who had agreed to refute Golatte's account of the events. Nor does Golatte provide any

16

basis to support his claim that Officer Schmidt—who worked in a different unit, had no relationship with the other defendants, and confirmed that Golatte was an informant she supervised—conspired to refute Golatte's claims. In short, the plaintiff has not adduced specific facts sufficient to support a jury verdict in his favor on his conspiracy theory. Accordingly, summary judgment is granted for the defendants on Golatte's conspiracy claim.

## V. Malicious Prosecution

Golatte also brings a state law malicious prosecution claim against all defendants, on the grounds that his criminal prosecution for aggravated assault on four peace officers and criminal damage to government property was contrived by the defendant police officers to justify their use of excessive force, and that the City of Chicago is liable under a theory of *respondeat superior*. "To state a cause of action for the tort of malicious prosecution, the plaintiff must prove five elements: (1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 26, 131 N.E.3d 488, 495 (Ill. 2019) (internal quotation marks omitted). The absence of any of these elements bars a plaintiff's malicious prosecution claim. *Id.* Liability for malicious prosecution "extends to all persons who played a significant role in causing the prosecution of the plaintiff," including police officers, "provided all of the elements of the tort are present." *Id.* ¶ 43 (citing *Frye v. O'Neill*, 166 Ill. App. 3d 963, 975, 520 N.E.2d 1233, 1240 (Ill. App. Ct. 1988)). "Police officers may be subject to liability for malicious prosecution if they initiate a criminal proceeding by presentation of false statements, or by withholding exculpatory information from the prosecutor." *Id.* ¶ 44 (cleaned up).

Golatte alleges that he was charged in the absence of probable cause and that the defendants completed false, misleading, and incomplete official reports, gave false statements regarding the circumstances of his detention, provided false testimony at trial, and invented false claims to justify their use of excessive force in the absence of probable cause to prosecute him. Compl. ¶¶ 23-24. As noted, probable cause exists if "the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Abbott*, 705 F.3d at 714. As to the charged crimes, an individual commits an aggravated assault on a peace officer when he engages in conduct that places another in reasonable apprehension of receiving a battery and he knows at the time of the assault that the other person is a peace officer performing official duties. 720 Ill. Comp. Stat. 5/12-2. An individual commits criminal damage to government property when he knowingly "damages any government supported property without consent of the State." 720 Ill. Comp. Stat. 5/21-1.01.

Here, the defendants assert that it is undisputed that Golatte knew that the four individuals near his car were police officers and that his actions in reversing the car and driving forward in close proximity to the officers placed them in reasonable apprehension of receiving a battery. Mem. Supp. MSJ at 16, ECF No. 109; DSOF ¶¶ 35, 48-49, 68-69. In addition, they allege that when Golatte reversed his car, he bumped into the unmarked police car behind him, causing damage that was not previously present.[14] DSOF ¶¶ 42, 47. But these facts are disputed and require further development. A jury could credit evidence that Golatte endangered the officers as he sought

---

[14] As noted, the plaintiff disputes defendants' allegations regarding damage to the police car, stating that the car "looked raggedy" prior to the incident and that photos of the damage were not taken until 19 days later. Pl.'s Resp. DSOF ¶ 47. The plaintiff does not dispute that he struck the police car, but states that he "didn't really smash into; he just bumped it." *Id.*

18

to speed away after Officer Gaeta broke his window; they might also reasonably credit evidence that all of the officers were standing in the middle of the street and that the shots fired entered the side of the car rather than the front in finding that the officers were not endangered by Golatte's flight. And while there is no dispute that Golatte's vehicle contacted the police car as Golatte reversed, there is ample dispute about the manner and pace at which Golatte drove in leaving the scene and whether the car was damaged as a result. These are highly fact-intensive questions as to which the summary judgment record does not provide clear answers. A trial would be needed to resolve them.

A trial on the malicious prosecution claim is not warranted, however, because Golatte has not shown evidence of malice. To show malice, a plaintiff "must allege that the officers committed some improper act after they arrested him without probable cause, for example, that they pressured or influenced the prosecutors to indict, made knowing misstatements to the prosecutor, testified untruthfully, or covered up exculpatory evidence." *McDade v. Stacker*, 106 F. App'x 471, 475 (7th Cir. 2004). While Golatte alleges in the complaint that the defendant police officers made false statements in his investigation and trial, nowhere in his statement of facts or response brief does Golatte indicate what false statements the defendants made or what aspects of the Battery Reports, Tactical Responses, and other documents they created or signed off on were false or misleading. *See* PSOF ¶¶ 27-31, 33; Resp. MSJ at 18-20, ECF No. 123. In the absence of affirmative evidence showing a dispute of material fact, summary judgment is granted for the defendants on Golatte's malicious prosecution claim.[15]

---

[15] Golatte brings his malicious prosecution claim against the City of Chicago under a *respondeat superior* theory. Compl. ¶ 60. In the absence of evidence demonstrating that the defendant officers maliciously prosecuted him, however, the City also cannot be held liable.

19

**VI.     Indemnification**

Finally, the defendants have moved for summary judgment on Golatte's indemnification claim, arguing that because the defendant officers "are not liable to the Plaintiff for any of the claims brought against them," Golatte is "not entitled to indemnification from the City." Mem. Supp. MSJ at 17, ECF No. 109. Because several of Golatte's claims against the defendant officers remain for resolution by a jury, summary judgment on the indemnification claim is denied.

* * * * *

For the foregoing reasons, the defendants' motion for summary judgment is granted in part and denied in part. Summary judgment for Officer Schmidt will be entered on all claims. Judgment in favor of Officers Dercola and Whigham will be entered on all claims other than the failure to intervene theory based on the use of excessive force. Judgment in favor of defendants Gaeta and Matheos is granted as to the Fourth Amendment claim to the extent that it is premised on false arrest (but not as to the traffic stop itself or the failure to intervene as to the traffic stop), the conspiracy claim, and the malicious prosecution claim. The motion is denied as to the City's indemnification claim. Thus, remaining for resolution are the plaintiff's excessive force claim against defendants Gaeta and Matheos and the failure to intervene to prevent the use of excessive force claim against defendants Dercola and Whigham, the Fourth Amendment and failure to intervene claims against defendants Gaeta and Matheos based on the traffic stop, and the indemnification claim against the City.

Date: August 3, 2020

John J. Tharp, Jr.
United States District Judge